UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

GEORGE T. GOROS,

      Plaintiff,

v.                                                    Case No:  2:16-cv-233-FtM-38CM

SUN LIFE ASSURANCE
COMPANY OF CANADA,

      Defendant.

_____

## REPORT AND RECOMMENDATION[1]

This matter comes before the Court upon review of Defendant's Dispositive Motion for Final Summary Judgment, or for Judgment on the Record, and Memorandum of Law in Support (Doc. 19) and Plaintiff's Motion for Summary Judgment and Judgment on the Record (Doc. 22).[2]  Defendant opposes Plaintiff's motion, and Plaintiff opposes Defendant's motion.  Doc. 26; Doc. 28.  For the

---

[1] A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See 11th Cir. R. 3-1.*

[2] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

reasons discussed below, the Court recommends that judgment be entered in favor of Defendant.

On March 25, 2016, Plaintiff filed a Complaint for Long-Term Disability and Life Waiver of Premimum [sic] Benefits against Defendant, seeking to recover benefits and address breaches of fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*   Doc. 1 at 1.   Defendant is a foreign corporation engaged in the insurance business in Collier County, Florida and the claims administrator of the Long-Term Disability ("Long-Term Policy") and Life Insurance Waiver of Premium Policies ("Waiver Policy") (collectively, "Insurance Policies").   *Id.* at 1-2.

Defendant initially approved Plaintiff's claims for benefits under the Insurance Policies effective November 28, 2012.   Tr. 000514-19, 000605-06.[3]   Based on its review of updated medical information, surveillance and the opinions of two independent medical reviewers, however, Defendant subsequently determined that Plaintiff no longer qualified for benefits under the Waiver Policy on August 28, 2014 and under the Long-Term Policy on September 9, 2014, and terminated the benefits. Doc. 19 at 7-8; Tr. 000906-08, 000913-18.   On September 5, 2014, Plaintiff, through his counsel, administratively appealed Defendant's decision, and Defendant affirmed

---

[3] Defendant electronically filed a complete copy of the administrative record in CM/ECF.   Doc. 14 at 1.   The transcript page numbers refer to the Bates numbers Defendant assigned to each page of the record.   *Id.*   The electronic copy of the record, however, is missing the last page of Richard D. Corzatt, M.D.'s opinion.   Tr. 000903.   Defendant separately and electronically filed the missing page, and Plaintiff also attached a complete copy of Dr. Corzatt's opinion to its motion for judgment on the record.   Doc. 22-1; Doc. 27-2.

its decision.   Tr. 000921-22, 001190-1203, 001212-29.   Plaintiff brings this lawsuit

challenging Defendant's decision to terminate Plaintiff's benefits.[4]   Doc. 1 at 4.

## I.    The Insurance Policies

Plaintiff was employed as an Executive Vice President of Manufacturing

Operations by United Plastic Fabricating, Inc. ("United Plastic") from October 1996

to November 2012.   Tr. 000106, 000488-89.   As a vice president, he had

administrative responsibility for the company's three manufacturing plants in

Michigan, Massachusetts and Florida.   Tr. 000116.   According to the occupational

analysis,[5] Plaintiff's job as a vice president is at the light physical exertional level[6]

and is classified as light work.   Tr. 000292.   The analysis provides that:

> [Plaintiff's] occupation [] involves occasional reaching, handling,
> fingering, pushing/pulling far acuity, depth perception, field of vision,
> walking and standing; frequent talking, keyboarding, sitting and near
> acuity; and constant hearing.   This occupation also involves occasional
> traveling. The job description indicates that the physical demands
> include frequent sitting, talking and hearing; occasional standing,
> walking, using hands to finger, handle or feel, and reach with arms and
> hands; and occasion lifting and or moving up to 25 pounds. The lifting
> and carrying requirements exceed how the occupation is typically
> performed in the general economy.

*Id.*

---

[4] Any issue not raised by Plaintiff on appeal is deemed to be waived.   *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (holding that "a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

[5] On January 16, 2013, Mary Witek, a vocational consultant, provided an occupational analysis of Plaintiff's occupation at Defendant's request.   Tr. 292-94.

[6] The occupational analysis explains that work at the light physical exertional level requires exerting up to 20 pounds of force occasionally or up to 10 pounds of force frequently, or a negligible amount of force constantly to move objects.   Tr. 000292.   The analysis further notes that a job may be classified as light work even if it involves lifting a negligible amount "1. when it requires walking or standing to a significant degree, or 2. when it requires sitting most of the time[,] but entails pushing or pulling of arm or leg controls. . . ."   *Id.*

Plaintiff was an eligible participant of the group insurance policies with Defendant because of his employment with United Plastic.   Doc. 1 ¶ 12; Tr. 000035. Part of the group insurance policies were the Waiver Policy and the Long-Term Policy, both of which Defendant issued, funded and administered.   Doc. 1 ¶ 11; Tr. 000035.   The terms of the policies delegate upon Defendant full discretionary authority to make all final determinations regarding claims for benefits.   Doc. 19 at 12; Tr. 000096.   Defendant's discretionary authority includes, but is not limited to, determining eligibility for benefits and the amount of any benefits due, and construing the terms of the Insurance Policies.   Doc. 19 at 12; Tr. 000096.

In dispute here are the Waiver Policy and the Long-Term Policy.   Doc. 1 ¶ 1. The Waiver Policy allows for continued life insurance without further payment of premiums if an employee becomes totally disabled.   Doc. 1 ¶ 13; Tr. 000060.   Under the Waiver Policy, an employee is totally disabled and qualifies for benefits if because of injury or sickness, he is unable to perform the material duties of any occupation for which he is or becomes reasonably qualified for by education, training, or experience.   Doc. 1 ¶ 15; Tr. 000049.   This policy provides that Defendant may require periodic proof of continued total disability and may terminate benefits in certain events including when the employee fails to furnish any required proof of continued total disability.   Doc. 19 at 7 n.3; Doc. 26 at 10 n.8; Tr. 000060.

On the other hand, the Long-Term Policy provides a monthly benefit if an employee is totally or partially disabled.   Doc. 1 ¶ 13; Tr. 000078.   An employee is deemed totally disabled and qualifies for benefits if (1) during the elimination period

and the next 24 months, he is unable to perform the material and substantial duties of his own occupation because of injury or sickness, and (2) he is not working or is earning less than 20% of his indexed total monthly earnings.   Doc. 1 ¶ 14; Doc. 19 at 7; Doc. 26 at 10; Tr. 000078.   To receive benefits, an employee also is required, among other things, to provide proof of continued total or partial disability.   Doc. 26 at 10; Tr. 000078.   The Insurance Policies state that proof must be satisfactory to Defendant.   Doc. 19 at 12; Tr. 000096.

The Insurance Policies define the following relevant terms:

**Sickness** means illness, disease or pregnancy. Any disability, because of Sickness, must begin while the Employee is insured under this Policy.

. . .

**Elimination Period** means a period of continuous days of Total or Partial Disability for which no [Long-Term Disability] Benefit is payable. The Elimination Period is shown in Section I, Schedule of Benefits and begins on the first day of Total or Partial Disability.

If the Employee returns to work for 15 working days or less during the Elimination Period and cannot continue working, the Total or Partial Disability will be treated as continuous. However, only those days that the Employee is Totally or Partially Disabled will count toward satisfying the Elimination Period.

. . .

**Material and Substantial Duties** means, but is not limited to, the essential tasks, functions, skills or responsibilities required by employers for the performance of the Employee's Own Occupation. Material and Substantial Duties does not include any tasks, functions, skills or responsibilities that could be reasonably modified or omitted from the Employee's Own Occupation.

. . .

> **Own Occupation** means the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior to the first date Total or Partial Disability began. Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location.
> . . .

Tr. 000048, 000054-55.

## II.   Plaintiff's Medical History Before Defendant's Approval of Benefits

On January 4, 2013, Plaintiff filed a Long-Term Disability claim with Defendant, alleging that he had pain in his neck, back and hips, and periodically in his knees, all caused by his spinal arthritis. Doc. 19 at 3-4; Tr. 000104-06, 000149-51.   In support of his claim, Plaintiff submitted to Defendant various medical evidence, including the opinions of his treating rheumatologist, Daniel Kunz, D.O. Tr. 000108-10, 000172-75.

Plaintiff first saw Dr. Kunz on November 18, 2012 because he had persistent low-back pain and stiffness and hip pain and stiffness for two years.   Tr. 000146. Plaintiff had a history of alcohol use, drank approximately two to four drinks per week and rode a motorcycle as his hobby.   Tr. 000148.   Plaintiff reported that his pain and stiffness affected his spine, and it took him 10 minutes even to get out of bed every morning.   Tr. 000146.   Plaintiff indicated that although he felt better by the late afternoon, any inactivity caused the stiffness and pain to return.   *Id.*

Plaintiff told Dr. Kunz that he had tried Celebrex and Vicodin for his symptoms, which caused various side effects.   *Id.*   Plaintiff complained that he had great loss of range of motion in the cervical, thoracic and lumbar spines.   *Id.* Plaintiff further reported that he was unable to work because of pain, stiffness and

physical limitations caused by losing spinal range of motion.   Doc. 19 at 4-5; Tr. 000150.   Plaintiff also told Dr. Kunz that he could not drive because he could not turn his head.   Doc. 19 at 4; Tr. 000150.

Dr. Kunz noted that Plaintiff's 2011 MRI showed bilateral bone marrow swelling involving the greater and lesser trochanters [7] and swelling within the corresponding tendons.   Tr. 000146.   Although Plaintiff's hips had reduced range of motion with associated discomfort, he did not have any other joint inflammation.   Tr. 000149.

Dr. Kunz opined that Plaintiff had inflammatory back symptoms with markedly reduced range of motion in cervical, thoracic and lumber spines.   *Id.*   Dr. Kunz noted that Plaintiff had a history of psoriasis, anemia, leukocytosis,[8] and colon inflammation with elevated markers of inflammation.   *Id.*   Based on his findings, Dr. Kunz diagnosed Plaintiff with ankylosing spondylitis. [9]   *Id.*   Dr. Kunz prescribed a biological medication, Simponi,[10] to reduce Plaintiff's symptoms and to prevent spinal fusion.   *Id.*

---

[7] Trochanters are places where hip and thigh muscles attach.   MedicineNet.com, http://www.medicinenet.com/script/main/art.asp?articlekey=10448 (last visited June 27, 2017).

[8] Leukocytosis refers to an increase in the total number of white blood cells. Medscape, http://emedicine.medscape.com/article/956278-overview (last visited June 27, 2017).

[9] Ankylosing spondylitis is a form of arthritis that primarily affects the spine. Spondylitis Association of America, http://www.spondylitis.org/Ankylosing-Spondylitis (last visited May 11, 2017).

[10] Simponi is a tumor necrosis factor inhibitor used to treat rheumatoid arthritis.   Tr. 000490.

On January 4, 2013, Plaintiff filed his claim for benefits.   Doc. 19 at 4; Tr. 000104-06.   In support of Plaintiff's claim, Dr. Kunz completed an Attending Physician Statement, noting that Plaintiff has ankylosing spondylitis with a "significant reduction in spinal movement," "pain, stiffness, [and] limitation of movement."   Doc. 19 at 4; Tr. 000172.   Dr. Kunz opined that Plaintiff has severely limited functional capacity and is incapable of performing minimum, sedentary activities.   Tr. 000173.   Based on his findings, Dr. Kunz determined that Plaintiff may stand/walk for one to four hours, sit for one to three hours and drive for one to three hours.   *Id.*   Dr. Kunz also indicated that Plaintiff is not able to bend, squat, climb, twist his body, push, pull, balance, kneel, crawl or grasp and can lift only up to 10 pounds.   *Id.*   Dr. Kunz concluded that Plaintiff could not work with his limitations and is not capable of another occupation on a full-time or part-time basis. Tr. 000174.   He further opined that Plaintiff's limitations are permanent.   *Id.*

Nonetheless, Dr. Kunz stated that he had been treating Plaintiff with Simponi injections on a monthly basis since November 16, 2012, and Plaintiff's conditions had improved.   Tr. 000172-73.   Furthermore, Dr. Kunz noted that Plaintiff was ambulatory and had not been hospital-confined.   Tr. 000173.

On January 16, 2013, Defendant obtained the occupational analysis from Witek, which classified Plaintiff's occupation as light work.   Doc. 19 at 4; Tr. 000292. On January 22, 2013, Defendant also conducted an in-person interview with Plaintiff at his residence.   Tr. 000485.   Plaintiff told the interviewer that he had joint problems since the late 1990s or early 2000s; and the pain and stiffness in his hand,

neck and back had worsened over the years.   Tr. 000489.   Plaintiff reported, however, that he had a CT scan on October 19, 2011, which did not reveal any irregularities.   Tr. 000490.

According to the interview, on November 16, 2012, Plaintiff notified his primary care physician that his joint pain had become excruciating, and the physician referred him to Dr. Kunz.   *Id.*   Plaintiff saw Dr. Kunz shortly thereafter and also had a follow-up appointment with Dr. Kunz on January 15, 2013.   *Id.*   Plaintiff told the interviewer that after examining Plaintiff's previous CT scan results, Dr. Kunz determined that Plaintiff's hip bones were fusing to other bones and diagnosed him with ankylosing spondylitis.   *Id.*   Dr. Kunz prescribed Simponi medication to Plaintiff, which was administered once per month.   *Id.*   Plaintiff reported that after receiving Simponi injections, his muscles and joints burned for a few days, and he felt weak and nauseous for approximately one week.   *Id.*   Regardless, Plaintiff noticed an increase in his joints' range of motion after he began receiving the treatment.   *Id.* The interviewer noted that Plaintiff's prognosis for recovery was unclear, and Dr. Kunz did not believe it was positive.   Tr. 000496.   Plaintiff also stated that he was not aware of any accommodations that would allow him to return to his job.   *Id.*

In addition, on March 4, 2013, Defendant obtained a peer review of Plaintiff's medical records from Nadia Habal, M.D.   Tr. 000504.   Dr. Habal opined that Plaintiff's medical records supported the diagnosis of ankylosing spondylitis.   Tr. 000508.   She noted that Plaintiff had severe limitations in range of motion for his neck and spine.   *Id.*   She also indicated that Plaintiff lost a significant degree of

mobility, experienced a significant degree of deformity in his cervical spine and may experience pain by standing or sitting.   *Id.*   Furthermore, she opined that spinal arthritis may contribute to Plaintiff's shortness of breath.   *Id.*   Dr. Habal agreed with Dr. Kunz's findings and opinions that Plaintiff could not work eight hours a day with his current restrictions, and Plaintiff's range of motion would not return because the damage already done to Plaintiff's spine could not be reversed.   Tr. 000509.

Based on her findings, Dr. Habal concluded that Plaintiff could not sustain light duty employment in his own occupation on a full-time basis with or without restrictions/limitations or modifications because Plaintiff would not be able to sit or walk for more than an hour at a time.   *Id.*   She noted that Plaintiff also could not sustain sedentary employment on a full-time basis with or without restrictions/limitations or modifications because Plaintiff could not lift at all.   Tr. 000510.

### III.   Defendant's Approval of Plaintiff's Benefits

On March 7, 2013, based on its review of the information received, Defendant approved Plaintiff's claims under the Long-Term Policy effective November 28, 2012. Doc. 19 at 4; Doc. 26 at 4-5; Tr. 000514, 000517.   Defendant determined that Plaintiff was entitled to a monthly benefit of $8,057.17, which Plaintiff could receive up to age 66 and four months.   Tr. 000517.   Defendant began processing payments of Plaintiff's benefits on February 27, 2013.   *Id.*   Defendant noted, however, that it may require Plaintiff's ongoing proof of claim to determine whether he continued to qualify for benefits.   *Id.*   On May 17, 2013, Defendant also approved Plaintiff's

benefits under the Waiver Policy subject to Plaintiff's continuing proof of claim.   Tr. 000605.

On November 22, 2013 and January 21, 2014, Defendant offered lump sum payments to Plaintiff in efforts to settle Plaintiff's claims because Defendant believed that Plaintiff would be unable to perform the duties of his own occupation throughout the life of the Insurance Policies.   Doc. 19 at 5; Tr. 000631-32, 000638-39.   Plaintiff did not accept these offers.   Doc. 19 at 5.

On April 4, 2014, Defendant began a periodic update of Plaintiff's file.   Tr. 000641.   On April 22, 2014, Defendant obtained an updated background report regarding Plaintiff.   Tr. 000660-73.   According to the report, Plaintiff's ex-wife, who then lived with Plaintiff, posted photographs on social media, showing that she and Plaintiff went on a 300-mile motorcycle trip in June 2013.   Tr. 000660-61.   This and other social media posts led Defendant to believe that Plaintiff was much more active than he had represented to his doctors and Defendant.   Doc. 19 at 5; Doc. 26 at 6.

As a result, Defendant conducted video surveillance[11] of Plaintiff from April 25, 2014 to April 27, 2014 to determine whether Plaintiff accurately reported his limitations.   Doc. 19 at 5; Doc. 26 at 6; Tr. 000678-95.   On the first morning of surveillance, Plaintiff was seen walking quickly, bending, leaning forward, and getting in and out of and driving a low-profile sports car.   Doc. 19 at 5; Doc. 21; Doc. 26 at 6; Tr. 000678, 000681.   He also was observed pushing a fertilizer spreader

---

[11] Defendant filed three computer disks containing surveillance videos for the Court's review.   Doc. 21.   The Court reviewed the videos contained in the disks.   *Id.*   The content of the videos also was summarized by the investigator.   Tr. 000678-95, 000763-75.

around his residence, spinning quickly while holding the fertilizer spreader, examining sprinklers and stomping on the ground with his right foot.   Doc. 21; Tr. 000678.   In the afternoon, Plaintiff went to a bar where he was seen exiting the bar to smoke cigarettes, turning his body and head, and drinking three martinis while sitting on a bar stool and leaning against the bar.   Doc. 21; Tr. 000678, 000680.

On the second day of surveillance, Plaintiff returned to the bar where he was observed twice bending at the waist and reaching into his car's trunk.   Doc. 21; Tr. 000680.   He also walked between the bar and his car and remained at the bar until late morning.   Doc. 21; Tr. 000680.   He again was seen driving his car several times and going to a store where he bent at his waist and knees and squatted while handling a floor mat.   Doc. 21; Tr. 000680.

On the third day, Plaintiff bent at the waist and knees, carried a small piece of glass, leaned forward, lifted a metal table frame above his head, carried a wooden table with the help of another person and walked around his property.   Tr. 000680; Doc. 21.   At his residence, he was observed carrying a couch with the help of another man, reaching above his head with his left hand, carrying the couch and a large glass panel, stepping backward and bending at the waist.   Tr. 000680; Doc. 21.   He also was seen going to a restaurant where he bent down while smoking a cigarette and walking to a store where he pushed a shopping cart, placed items in the cart and leaned forward.   Tr. 000680; Doc. 21.   In the afternoon at his residence, Plaintiff carried several small tables and bent at the waist.   Tr. 000680; Doc. 21.

In addition to the surveillance, Defendant obtained Plaintiff's updated medical records.   Doc. 19 at 6; Doc. 26 at 7.   On February 1, 2013, Dr. Kunz examined Plaintiff and noted that he showed improvement with the Simponi treatment, as Plaintiff felt that his range of motion in his neck increased, and he could see more of his shoulders and to his sides.   Tr. 000713.   Dr. Kunz indicated that there had been a "noticeable decrease" in Plaintiff's pain, letting Plaintiff rely less on his pain medications.   *Id.*   Dr. Kunz also stated that although Plaintiff still had stiffness in the morning, this symptom had improved; and Plaintiff no longer had any negative reactions to the Simponi treatment.   *Id.*   Plaintiff told Dr. Kunz, however, that he still had pain at night while sleeping and wanted help coping with this problem.   *Id.*

Nonetheless, Plaintiff's physical exam showed that Plaintiff was not in acute distress and was alert with no focal neurological deficits.   Tr. 000714.   Plaintiff also had slightly improved range of motion in his cervical spine.   Tr. 000714. Furthermore, Plaintiff did not have any swollen lymph nodes in his cervical spine or above his clavicle.   *Id.*

Plaintiff returned to Dr. Kunz on May 10, 2013.   Tr. 000717.   Plaintiff reported to Dr. Kunz that he recently was under good control, although he had both good and bad days.   *Id.*   Plaintiff noted that on good days, he had stiffness for 15 minutes in the morning and pain that was tolerable with his pain medications.   *Id.* Even on bad days, Plaintiff stated that his pain was tolerable with his pain medications.   *Id.*   He further indicated that his bad days were markedly better since he started receiving the Simponi treatment.   *Id.*   Plaintiff noted that range of

motion in the cervical spine had improved significantly with Simponi, and his stretching exercises helped him.   *Id.*   Furthermore, Plaintiff stated that taking pain medications also helped him.   *Id.*   As a result, Dr. Kunz found, "clear medication benefit."   *Id.*

During this visit, Plaintiff again was not in acute distress and continued to be alert and oriented with no focal neurological deficits.   Tr. 000718.   He also had no swollen lymph nodes in his cervical spine or above his clavicle, although he had reduced range of motion in his hips, which was associated with discomfort.   *Id.* Plaintiff had no fluid or swelling in his extremities.   *Id.*   Hence, Dr. Kunz opined that Plaintiff's spinal arthritis showed "good improvement," although Plaintiff recently had a few bad days.   *Id.*   Dr. Kunz noted that even Plaintiff's bad days were better than before receiving the Simponi treatment, and he had increased range of motion in his cervical spine and decreased pain and stiffness.   Tr. 000718-19.   In contrast, Dr. Kunz indicated that Plaintiff had shortness of breath on exertion, which was a component of his limited chest expansion, due to his spinal arthritis.   Tr. 000719.   Dr. Kunz noted that Plaintiff drank alcohol "moderately," and advised him not to drink a few days before the laboratory tests.   *Id.*

On September 16, 2013, Plaintiff visited Dr. Kunz.   Tr. 000721.   Plaintiff noted that although he had some burning mid-thoracic pain after prolonged sitting or standing, the pain went away soon after he moved, and he did not take any medication for this pain.   *Id.*   Dr. Kunz opined that this was not a serious issue. Tr. 000724.   Plaintiff also demonstrated no neurological symptoms, extremity

paresthesia,[12] numbness or weakness.   Tr. 000721.   Plaintiff indicated that he did not have nighttime pain when he slept.   *Id.*   He continued to show good responses to his Simponi treatment, as his pain and stiffness were overall markedly better.   *Id.*   Plaintiff further reported that he had been exercising, gained muscle mass and noticed increased mobility in his spine and neck.   *Id.*   He also reported to Dr. Kunz that he was "in a better place both mentally and physically," and had no adverse effects from Simponi.   *Id.*   He denied having any worsening shortness of breath, chest pain, abdominal pain or swollen lymph nodes.   *Id.*

Dr. Kunz saw Plaintiff on January 14, 2014.   Tr. 000727.   Dr. Kunz noted that Plaintiff continued to show good improvement with the Simponi treatment, as he had stiffness for less than one hour instead of multiple hours.   *Id.*   Dr. Kunz opined that although Plaintiff's range of motion slightly decreased, it was because Plaintiff had not been exercising.   *Id.*   Dr. Kunz also indicated that Plaintiff's pain continued to improve and was under control.   *Id.*   Dr. Kunz stated, however, that Plaintiff had right toe paresthesia, and a MRI showed degenerative disc disease.   *Id.*   Dr. Kunz noted that he was "struck by the amount of degenerative disc disease in [Plaintiff]," although Plaintiff could have had the degenerative manifestations before he developed spinal arthritis.   Tr. 000728.   Nonetheless, Plaintiff reported that he was doing well, although pain in his right foot started in the previous September and

---

[12] Paresthesia refers to a burning or prickling sensation that usually occurs in the hands, arms, legs or feet.   National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/All-Disorders/Paresthesia-Information-Page   (last visited June 27, 2017).   Paresthesia is generally painless.   *Id.*

had been becoming progressively worse.   *Id.*   As a result, in addition to continuing Plaintiff's Simponi injections, Dr. Kunz referred Plaintiff to Dr. Stanton, a spine doctor.   *Id.*

On May 12, 2014, Dr. Kunz examined Plaintiff and noted that Plaintiff continued to have stiffness for approximately 20-25 minutes in the morning and aching pain in his hips and back.   Tr. 000934.   Plaintiff reported that pain in his neck was worse.   *Id.*   On the other hand, Plaintiff had no radicular symptoms or paresthesia.   *Id.*   Plaintiff also stated that he continued to see an improvement from Simponi, although he felt worse during this particular visit.   *Id.*   Furthermore, he told Dr. Kunz that he was moving from New Hampshire to Florida in June 2014.   *Id.*   Dr. Kunz noted that he would like to check inflammatory markers to see if they were elevated again.   Tr. 000935.   He indicated that if inflammatory markers were elevated, Plaintiff may need to discuss this issue with his rheumatologist in Florida and switch from Simponi to another biological agent.   *Id.*   Meanwhile, Dr. Kunz continued Plaintiff on Simponi.   *Id.*

In addition to Dr. Kunz, Plaintiff reported his physical activities to other doctors.   On February 18, 2014, Plaintiff saw Aaron Colman, M.D., for his right foot pain.   Tr. 000829.   Dr. Colman noted that Plaintiff enjoyed "power walking," and walked 2.5 miles daily.   *Id.*   On March 12, 2014, Plaintiff reported to his primary physician, Erika S. Blank, M.D., that he walked 2 miles every day at a speed of 3.9 miles per hour with a 5% incline.   Tr. 000857.   Dr. Blank indicated that Plaintiff

had a "great exercise tolerance of more than 4 Met[s]."[13]   Tr. 000861.   On April 3, 2014, Plaintiff told Dr. Colman that he had minimal pain and had been walking on the treadmill a few days after having a right great toe cheilectomy[14] and an injection on March 21, 2014.   Tr. 000839.

From May 19, 2014 to May 24, 2014, Defendant conducted additional video surveillance of Plaintiff.   Tr. 000763-79; Doc. 21.   Similar to the last surveillance, Plaintiff was observed walking, bending, leaning forward, stepping up and down curbs, carrying poster boards, lifting a wheeled seat above his shoulders, visiting various establishments, driving his car and having a garage sale at his residence. Tr. 000763-64; Doc. 21.

On July 28, 2014, Richard D. Corzatt, M.D., conducted an independent medical review of Plaintiff's file for Defendant.   Tr. 898.   Based on the review of the records furnished by Defendant, Dr. Corzatt opined that Plaintiff's spinal arthritis had responded favorably to the Simponi treatment, and his condition was better than it was when he stopped working on November 28, 2012.   Tr. 000902.   Dr. Corzatt observed that according to the surveillance video, Plaintiff was very active during the day, frequented bars and could stand and walk frequently and lift 20 pounds

---

[13] METS are Metabolic Equivalents, a procedure used to quantify the energy cost of activities and to measure the functional capacity or aerobic power of an individual.   For example, a person participating in a tennis game with a slight change from normal state would exercise at approximately 4 METS.   Maurice Jetté, Metabolic Equivalents (METS) in Exercise Testing, Exercise Prescription, and Evaluation of Functional Capacity, 13 Clinical Cardiology 555, 555, 560 (1990).

[14] Cheilectomy is an operation to remove a bony lump on the top of the main joint of the big toe.   NHS North Bristol, Cheilectomy of the big toe (May 2014), https://www.nbt.nhs.uk/sites/default/files/attachments/Cheilectomy%20of%20the%20Big%20Toe_NBT002180.pdf.   The bony lump is caused generally by arthritis of the great toe.   *Id.*

occasionally.   Tr. 000902-03.   Dr. Corzatt noted that Plaintiff's activities appeared to be compatible with a light occupation and far exceeded Dr. Kunz's recommended restrictions and limitations.   Tr. 000903.   Dr. Corzatt further indicated that although Plaintiff was receiving "state-of-the-art treatment" for his spinal arthritis, he was frequently consuming alcohol, contrary to his physician's recommendations.[15] *Id.*

Dr. Corzatt concluded that based on Plaintiff's activities demonstrated in the video surveillance, Plaintiff is capable of a sedentary occupation and should be able to sit frequently changing positions every 45 minutes as needed, stand and walk frequently no more than an hour at a time, occasionally lift up to 20 pounds and use a keyboard on a frequent basis.   *Id.*; Doc. 22-1 at 7.   Upon its review of the video surveillance, Plaintiff's medical records and other information on file, Defendant determined that Plaintiff failed to establish his continued eligibility for benefits, and ceased benefits in August and September 2014.   Doc. 19 at 7-8; Doc. 26 at 10-11; Tr. 000906-08, 000913-18.

## IV.   Plaintiff's Medical History After Termination of Benefits

On September 19, 2014, Plaintiff saw Sash S. Seshadri, M.D., after moving to Florida from New Hampshire.   Doc. 22 at 7; Tr. 000944.   Plaintiff reported that he had great difficulty dressing himself, including tying his shoe laces and fastening buttons, walking two miles and participating in recreational activities and sports.

---

[15] Chad Cabral, D.O., who examined Plaintiff for elevated liver enzymes, advised Plaintiff to refrain from drinking alcohol on January 16, 2014 and May 30, 2014.   Tr. 000785, 000791.

Tr. 000944.   He also told Dr. Seshadri that he had some difficulty with getting in and out of bed, walking outdoors on flat grounds, washing and drying his entire body, bending down and picking up clothing from the floor and getting in and out of a car. *Id.*

Plaintiff reported that he had persistent back and neck pain and bilateral groin pain.   *Id.*   He further indicated that he noticed numbness in the back of his legs and his right big toe since he moved to Florida.   *Id.*   He also noted that he had numbness in his spine lasting for an hour.   *Id.*   He stated that Simponi only helped him "partially."   *Id.*   Plaintiff denied, however, any weakness and stated that he was able to get up from a low lounge chair, and his arms did not get tired from doing overhead work.   Tr. 000945.

Plaintiff's physical exam during this visit revealed that he had non-painful range of motion in his neck and no swelling in his extremities.   *Id.*   Plaintiff showed no inflammation of the joint lining in the small joints of his hands or feet and no tenderness in the MCP joints.[16]   *Id.*   On the other hand, Plaintiff's lumbar spine was almost fused, and Plaintiff had only 5 degrees of lateral bending in the cervical spine.   *Id.*   Plaintiff had mildly decreased ranges of motion in his hips bilaterally, although he indicated that it was worse in his left hip.   *Id.*   He also noted that his range of motion was painful.   *Id.*   Based on these findings, Dr. Seshadri opined that Plaintiff had ankylosing spondylitis with almost completely fused cervical and

---

[16] The MCP joint indicates the metacarpophalangeal joint or knuckle.   American Society for Surgery of the Hand, http://www.assh.org/handcare/hand-arm-conditions/MP-Joint-Arthritis (last visited May 17, 2017).

lumbar spines, which also affected his hips.   *Id.*   She also indicated Plaintiff's long-term use of medications.   *Id.*   She noted that Plaintiff may continue on Simponi, but advised Plaintiff to obtain pain management and a neurological assessment.   *Id.*

On September 30, 2014, Plaintiff saw Amy Mellor, M.D., at Dr. Seshadri's referral because of concerns about possible cauda ecquina syndrome.[17]   Tr. 000969, 000971.   During this visit, Plaintiff's neck was supple, and his cranial nerves were normal.   Tr. 000971-72.   He also had no tenderness in his cervical spine, although he had severely decreased range of motion in his cervical spine.   Tr. 000972.   Furthermore, Plaintiff's motor exam was normal.   *Id.*   Dr. Mellor diagnosed Plaintiff with ankylosing spondylitis and lumbar radiculopathy[18] and ordered MRIs of his spine.   *Id.*

Plaintiff's MRI of the lumbar spine from October 6, 2014 revealed that Plaintiff had multilevel disc and facet disease, which was mild in nature, with multifactorial mild central canal stenosis[19] at L3-4 and mild to moderate neural foraminal stenoses within the lower lumber spine.   Tr. 000975.   After reviewing Plaintiff's MRI,

---

[17] Cauda ecquina syndrome affects a bundle of nerve roots called cauda equine and may cause damages leading to permanent paralysis of the legs.   WebMD, http://www.webmd.com/back-pain/guide/cauda-equina-syndrome-overview#1 (last visited May 17, 2017).

[18] Radiculopathy causes pain, numbness, tingling, or weakness because of a compressed nerve in the spine.   MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm (last visited June 27, 2017).

[19] Lumber stenosis occurs in the lower back when the spinal nerve roots in the lower back become compressed and cause symptoms, such as tingling, weakness, or numbness. Spine-health, https://www.spine-health.com/conditions/spinal-stenosis/what-spinal-stenosis (last visited June 23, 2017).   Cervical stenosis occurs in the neck.   *Id.*

however, David Hilario, M.D., found that there was normal lumbar lordosis,[20] and lumbar vertebral bodies had normal height and morphology.   *Id.*   Furthermore, he found no spondylolisthesis[21] and noted that Plaintiff's terminal end of the spinal cord was intrinsically normal.   *Id.*   Lastly, Dr. Hilario indicated that Plaintiff's bone marrow signal was unremarkable.   *Id.*

Plaintiff's October 13, 2014 MRI of the cervical spine showed that there was hypolordosis[22] of the cervical curvature, although his craniovertebral junction was normal, and his cervical cord demonstrated normal signal and morphology.   Tr. 000973.   Richard Paguara, D.O., examined Plaintiff's MRI.   Tr. 000974.   He opined that Plaintiff had multilevel mild to moderate degenerative disc disease without significant central stenosis, mild central canal stenosis at C4-C5 in part secondary to a left paracentral disc protrusion and mild ventral cord flattening, neural foraminal compromise most significantly found bilaterally and considered moderate at C3-C4, and multilevel facet arthropathy.[23]   Tr. 000973.

On October 10, 2014, Plaintiff saw Adam Shuster, D.O., because of his back and leg pain.   Tr. 000956, 000960.   Plaintiff was oriented to person, place and time,

---

[20] Lumbar lordosis indicates when an arch in the back is too far inward and affects the ability to move.   healthline, http://www.healthline.com/symptom/lordosis (last visited June 20, 2017).

[21] Spondylolisthesis is a spinal condition in which one of the lower vertebras slips forward onto the bone below and may cause lumber lordosis.   healthline, http://www.healthline.com/symptom/lordosis (last visited June 20, 2017).

[22] Lumbar Hypolordosis occurs when the low back has less curve than what is considered normal.   The Back Pain Authority, http://www.cure-back-pain.org/hypolordosis.html (last visited June 23, 2017)

[23] Arthropathy refers to any disease of the joints.   healthline, https://www.spine-health.com/glossary/arthropathy (last visited June 23, 2017).

and was not in distress.   Tr. 000959.   Plaintiff's head was normal, and his neck was supple and had no tracheal deviation.   *Id.*   His extraocular motions were normal, and his motor exam revealed that Plaintiff had 5/5 or 4/5 strength throughout.   Tr. 000960.   Dr. Shuster also noted that Plaintiff's gait was unassisted.   *Id.*

On the other hand, Dr. Shuster found that Plaintiff had fatigue, joint pain and joint stiffness.   Tr. 000958-59.   Plaintiff also showed decreased range of motion in the cervical and lumbar spine, tenderness to palpation in his right and left sacroiliac joints,[24] and various other joint problems.   Tr. 000959.   Plaintiff told Dr. Shuster that he had chronic pain that has reduced his levels of functioning.   Tr. 000961.

Nonetheless, Dr. Shuster opined that Plaintiff was stable on the current analgesic regimen without any significant side effects and was able to function well on the current regimen.   *Id.*   Dr. Shuster recommended that Plaintiff exercise and walk increasingly, continue with the current analgesic approach and explore non-medication-based options to control his pain.   *Id.*

On December 8, 2014, Plaintiff returned to Dr. Shuster, complaining of severe pain in his lower and mid-back, neck and right leg.   Tr. 000963.   Plaintiff reported that his pain was constant and penetrating, causing numbness, tingling and weakness for most of the time.   *Id.*   He stated that twisting, lying down and sitting aggravated his pain, although pain medication and resting helped alleviate his pain. *Id.*   Plaintiff noted that his pain affected his daily activities most of the time.   *Id.*

---

[24] The sacroiliac joint is next to the bottom of the spin, below the lumbar spine. Spine-health,                       https://www.spine-health.com/conditions/sacroiliac-joint-dysfunction/sacroiliac-joint-dysfunction-si-joint-pain (last visited May 23, 2017).

In contrast, Dr. Shuster again indicated that Plaintiff denied any significant side effects from the analgesic regimen and was able to function well on the regimen. *Id.* Plaintiff was able to move his four extremities, and his neck was supple, although he again had tenderness to palpation to his bilateral sacroiliac joints. Tr. 000964. Dr. Shuster's recommendation remained unchanged. Tr. 000965. His overall diagnosis and recommendation stayed the same when Plaintiff saw him on February 6, 2015. Tr. 000954.

On January 21, 2015, Plaintiff saw Dr. Kunz for his spinal arthritis. Tr. 000927. Plaintiff reported that he had had worsening back pain and stiffness and decreased range of motion since he last saw Dr. Kunz. *Id.* Plaintiff also told Dr. Kunz that although he had remained on the Simponi treatment, he felt that it did not help him like it did in the past. *Id.* He felt that he was worse than when he started Simponi in 2012. *Id.* Nonetheless, Plaintiff denied prolonged stiffness in the morning, nighttime pain and reduced range of motion in the cervical, thoracic and lumbar spine. *Id.* He reported that he tried to remain active and exercise while staying in Florida. *Id.*

Contrary to Plaintiff's subjective complaints, Dr. Kunz found that although Plaintiff had elevated inflammatory markers, Plaintiff had a good response to Simponi because it helped normalize Plaintiff's inflammatory markers, and his stiffness and pain showed an improvement. Tr. 000928. Dr. Kunz opined, however, that Simponi was no longer effective, and Plaintiff had worsening occiput

to wall and chest expansion as well as reduced range of motion in his cervical spine. *Id.*   Dr. Kunz recommended that Plaintiff try a trial of Enbrel medication.   *Id.*

On January 21, 2015, Dr. Kunz provided a second Medical Source Statement. Tr. 000942-43.   He opined that Plaintiff could lift and/or carry less than 10 pounds occasionally, stand and/or walk for a total of less than 30 minutes and sit for a total of less than 30 minutes.   Tr. 000942.   He also indicated that Plaintiff must alternate between sitting and standing to relieve pain and discomfort.   *Id.*   Dr. Kunz noted that Plaintiff's medical exams and MRIs support his conclusions.   *Id.*

Similar to his previous opinion, Dr. Kunz opined that Plaintiff could not climb, balance, stoop, bend, kneel, crouch or crawl, and could reach all directions, handle, finger and feel for less than 1/3 of the workday.   *Id.*   He also determined that Plaintiff must take a 10-minute break every 10 minutes for medical reasons.   *Id.* Furthermore, Dr. Kunz found that Plaintiff has limitations due to chronic pain and is required to lie down during the day to relieve pain.   Tr. 000943.   He opined that Plaintiff is expected to rest every 10 to 15 minutes in the morning and the afternoon each because of his spinal arthritis.   *Id.*

During an 8-hour workday, Dr. Kunz noted that Plaintiff could concentrate with no limitations, and follow, carry, remember and understand simple instructions and use judgment for 1/3 of the workday.   *Id.*   He further indicated that Plaintiff could respond to supervision, coworkers and usual work situations and deal with changes in a routine work setting for 2/3 of the workday.   *Id.*   Dr. Kunz noted that Plaintiff's limitations are the result of pain and medications, and Plaintiff has fatigue

and difficulty concentrating because of his medications' side effects. *Id.* Dr. Kunz expected Plaintiff to be off work tasks on a job more than 60% of the time and be absent from work more than 3 days per month because of his medical appointments and impairments. *Id.* Dr. Kunz indicated that his opinion was within a reasonable degree of certainty, Plaintiff's conditions existed since November 19, 2012, and he read the medical records before and after November 19, 2012. *Id.*

On January 26, 2015, Dr. Seshadri examined Plaintiff for his multiple joint pain and to review his lab results. Tr. 000947. He reported that his pain and level of functioning had worsened, as he had more than one hour of stiffness in the morning, generalized fatigue, and worsening joint and muscle aches and pains. *Id.* Plaintiff still indicated, however, that he had no side effects from the medication or any symptoms of infection. *Id.*

Dr. Seshadri opined that although Plaintiff had no swelling in his extremities, his lumbar spine almost was fused. Tr. 000947-48. Plaintiff also had only 5 degrees of lateral bending in the cervical spine, and a decreased range of motion in his bilateral hips, which he found painful. Tr. 000948. She noted that Plaintiff's spinal arthritis had become clinically worse. *Id.* She recommended periodic lab monitoring, pain management and neurology assessment. *Id.*

On January 26, 2015, Dr. Seshadri also provided her opinion regarding the effects of Plaintiff's limitations. Tr. 000949. She opined that Plaintiff has limitations due to chronic pain and is required to lie down during the day to relieve pain. Tr. 000949. She noted that Plaintiff is expected to rest for 0.5 hours in the

morning and the afternoon each because of his spinal arthritis. *Id.* She further indicated that during an eight-hour workday, Plaintiff may concentrate and follow, carry out, remember and understand simple instructions for 2/3 of the workday, and use judgment, respond to supervision and deal with changes in a routine work setting for 1/3 of the workday. *Id.* She expected that Plaintiff would be off work tasks on a job more than 60% of the time and absent from work more than three days a month due to doctors' appointments or medical impairments. *Id.* She noted that she read the medical records before and after November 19, 2012, her opinion was within a reasonable degree of medical certainty, and Plaintiff's conditions existed since November 19, 2012. *Id.*

## V.   Plaintiff's Appeal of Defendant's Decision

On September 14, 2014, Plaintiff appealed Defendant's decision, which Defendant reviewed on appeal. Tr. 000921-22. On May 15, 2015, Defendant obtained an independent review from D. Dennis Payne, Jr., M.D., who reviewed Plaintiff's updated medical records including the treatment notes of Drs. Seshadri and Mellor and the video surveillance. Tr. 001179-85. Dr. Payne opined that although Plaintiff's diagnosis of ankylosing spondylitis is established by the record, the clinical evidence does not support restrictions or limitations that would impact his function to any degree. Tr. 001183. He found the surveillance data particularly compelling. *Id.* Dr. Payne opined that Plaintiff has no restrictions or limitations "whatsoever" based on the video surveillance. *Id.* Dr. Payne further identified the difference between the reported and the actual functionalities as the "most prominent

and telling inconsistency" in Plaintiff's file because Plaintiff was observed standing, walking, bending, lifting, carrying, conversing and driving on a continuous and sustained basis.   Tr. 001184.

In June and July 2015, based on its review of Plaintiff's entire medical records and other information, Defendant denied Plaintiff's appeal of its decision to deny benefits and upheld its decision.   Tr. 001190-1203, 1212-29.

## VI.   Standard of Review

Pursuant to 29 U.S.C. § 1132, a person may bring a civil action "to recover benefits due to him under the terms of his plan, [or] to enforce his rights under the terms of the plan. . . ."   29 U.S.C. § 1132(a)(1)(B).   ERISA itself, however, does not provide the standard of review for actions under § 1132(a)(1)(B) appealing benefit eligibility determinations.   *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989).   As a result, the Eleventh Circuit has established a legal framework for courts' review of ERISA benefit decisions.   *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011).   The Eleven Circuit's test consists of the following six steps:

(1)   Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)   If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)   If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether

"reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)  If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)  If there is no conflict, then end the inquiry and affirm the decision.

(6)  If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355 (citation omitted).

Here, it is undisputed that Defendant has full discretion to determine claims. Doc. 19 at 12; Tr. 000096.  The terms of the Insurance Policies grant express full discretion upon Defendant to determine eligibility for benefits and to construe the terms of the Insurance Policies.   Tr. 000096; *see Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1353 (M.D. Fla. 2004) (finding that the defendant has discretion in making benefit determinations based on the terms of the plan).   As noted by Defendant, the parties acknowledge this by stipulating that the applicable legal standard here is the arbitrary and capricious standard of review.   Doc. 18; Doc. 19 at 12.   Accordingly, the Court will address whether Defendant's decision was arbitrary and capricious. *Howard v. Hartford Life & Acc. Ins. Co.*, 929 F. Supp. 2d 1264, 1287 n.19 (M.D. Fla. 2013) (holding that courts may bypass the *de novo* right or wrong determination and proceed directly to an arbitrary and capricious analysis because this approach allows courts to "'analyze the facts and the parties' arguments once in arriving at its conclusions' as to whether [the plan administrator's] decision was right or wrong, and if wrong, whether it was arbitrary and capricious.").

In an ERISA case, a court sits "more as an appellate tribunal than as a trial court" because "[i]t does not take evidence, but rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Howard*, 929 F. Supp. 2d at 1286 (internal quotation marks and citations omitted). Under the arbitrary and capricious standard of review, the court determines "whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross and Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989) (citations omitted). If the court finds a reasonable basis, the court must uphold the decision as not being arbitrary and capricious, even when there is evidence supporting a contrary conclusion. *Id.* at 1140.

Furthermore, "[a] plan administrator is entitled to weigh the evidence and resolve conflicting evidence about the claimant's disability." *Id.* (citation omitted); *Townsend v. Delta Family-Care Disability and Survivorship Plan*, 295 F. App'x 971, 977 (11th Cir. 2008) (citing *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 (11th Cir. 1997)). By resolving conflicting evidence, the administrator does not abuse its discretion even if the evidence comes close. *Howard*, 929 F. Supp. 2d at 1288 (citing *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1363 (11th Cir. 2008)). In reviewing the plan administrator's discretionary decision, the court only may consider "the facts known to the administrator at the time of the decision." *Howard*, 929 F. Supp. 2d at 1289 (internal quotation marks and citations omitted).

In an ERISA case, the plaintiff has the burden to prove his entitlement to contractual benefits under the plan.  *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).   The plaintiff has to prove that the plan administrator's decision was arbitrary even when a conflict of interest exists. *Blankenship*, 644 F.3d at 1355.   The Eleventh Circuit has held that a conflict exists "where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds."  *Id.* (citation omitted).   Similarly, when the plan administrator once approved benefits and subsequently terminated them, the plaintiff bears the burden of proving continued eligibility after benefits are discontinued.  *Howard*, 929 F. Supp. 2d at 1287 (citations omitted).

## VII.   Discussion

### a. *Defendant's reliance on Dr. Corzatt's opinion*

Plaintiff first argues that Defendant's decision to terminate benefits was arbitrary and capricious because the decision is not supported by any medical opinions.  Doc. 22 at 11.   Plaintiff asserts that in terminating benefits, Defendant relied on Dr. Corzatt's opinion, which provides that Plaintiff is able to "sit frequently changing positions every 45 minutes as needed, stand and walk frequently no more than an hour at a time, occasionally lift [up] to 20 pounds, and [use a] keyboard on a frequent basis."  Doc. 22 at 11; Doc. 22-1 at 7.   Plaintiff claims that he cannot work as a vice president with the limitations enumerated in Dr. Corzatt's opinion because according to Witek's occupational analysis, Plaintiff's occupation requires, among

other things, walking or standing to a significant degree or sitting most of the time and occasional traveling.   Doc. 22 at 12-13; Doc. 28 at 11-12.

Despite this discrepancy between the occupational analysis and Dr. Corzatt's opinion, Plaintiff argues that Defendant did not consider or address the limitations listed in Dr. Corzatt's opinion.   Doc. 22 at 12-13; Doc. 28 at 11-12.   In support, Plaintiff asserts that the record Defendant filed is missing the last page of Dr. Corzatt's opinion (Doc. 22-1 at 7), which contains the limitations enumerated above. Doc. 22 at 12; Doc. 28 at 11.   Defendant responds that it reviewed all of Dr. Corzatt's opinions, including the limitations at issue here.   Doc. 26 at 10.   Defendant argues that the last page of Dr. Corzatt's opinion inadvertently was omitted when Defendant's office staff was scanning the record.   *Id.* at 9.   Defendant claims that the limitations contained on the last page still support Plaintiff's ability to perform a light duty occupation.   *Id.* at 10.

Here, the Court recommends that Dr. Corzatt's opinion does not contradict the occupational analysis and supports Defendant's decision.   Plaintiff misstates the portion of the occupational analysis that work at the light exertional level "requires walking or standing to a significant degree or sitting most of the time. . . ."   Doc. 22 at 12; Doc. 28 at 11.   On the contrary, the analysis provides that work at the light physical exertional level requires exerting up to 20 pounds of force occasionally, up to 10 pounds of force frequently, or a negligible amount of force constantly to move objects.   Tr. 000292.   The analysis notes that a job may be classified as light work *even if it involves lifting a negligible amount* "1. when it requires walking or standing

to a significant degree, or 2. when it requires sitting most of the time[,] but entails pushing or pulling of arm or leg controls. . . ."  *Id.*   Hence, contrary to Plaintiff's allegation, light work may not require walking or standing to a significant degree or sitting most of the time.   *Id.*; Doc. 22 at 12; Doc. 28 at 11.

In fact, the occupational analysis explicitly states that Plaintiff's occupation requires "frequent" sitting and "occasional" standing, walking and traveling.   Tr. 000292.   The actual job description contained in the occupational analysis does not support more restrictions than "sit[ting] frequently changing positions every 45 minutes as needed, stand[ing] and walk[ing] frequently no more than an hour at a time, [and] occasionally lift[ing up] to 20 pounds," as stated in Dr. Corzatt's opinion. Doc. 22-1 at 7.   Furthermore, Dr. Corzatt did not opine that Plaintiff has any limitation on traveling, and even noted that Plaintiff's activities are compatible with a light occupation.   *Id.* at 6.

Plaintiff also does not present any evidence that the missing page of Dr. Corzatt's opinion was not before Defendant when Defendant decided to terminate Plaintiff's benefits.   Doc. 22 at 12; Doc. 28 at 11.   In contrast, Defendant argues that it considered the full opinion, but did not realize the opinion's last page was missing from the record.   Doc. 26 at 9-10.   As a result, the Court recommends that Defendant considered the limitations opined by Dr. Corzatt, and that Dr. Corzatt's opinion supports Plaintiff's ability to perform his own occupation.   Doc. 22 at 13.

### b. *A reasonable basis for Defendant's decision*

Plaintiff also argues that Defendant's decision was wrong and arbitrary because all of the medical opinions on the record, except Dr. Payne's opinion, would preclude Plaintiff from working in his own occupation. Doc. 22 at 13. As noted, Dr. Payne opined that Plaintiff has no restrictions or limitations "whatsoever," after reviewing the video surveillance and Plaintiff's updated medical records including the opinions of Drs. Habal, Mellor and Seshadri. Tr. 001179-83. Plaintiff asserts that the medical records, including the findings of Dr. Seshadri and the opinions of Drs. Habal, Corzatt, Kunz and Mellor contradict Dr. Payne's conclusion. Doc. 22 at 13-18. Defendant responds that Drs. Corzatt and Payne opined that Plaintiff's reported restrictions and limitations were not supported, and Plaintiff's medical records and the video surveillance support these opinions. Doc. 26 at 12-13.

The Court recommends that there was a reasonable ground for Defendant's decision. *See Jett*, 890 F.2d at 1139 (11th Cir. 1989) (citations omitted). As noted, the Court must uphold Defendant's decision as long as the decision had a reasonable basis, "even if there is evidence that would support a contrary conclusion." *Id.* at 1140. Here, Defendant correctly argues that the opinions of Drs. Corzatt and Payne support Defendant's decision. Doc. 26 at 12-13. As part of his review, Dr. Corzatt considered treatment notes of Dr. Kunz, who opined that Plaintiff could not work 8 hours per day with his restrictions and that his limitations are permanent. Tr. 000898, 000173-74. Dr. Corzatt also examined the opinion of Dr. Habal, who concurred with Dr. Kunz's findings. Tr. 000509. Even after reviewing Dr. Kunz's

treatment notes and Dr. Habal's opinion, Dr. Corzatt nonetheless opined that Plaintiff can perform a light occupation.   Tr. 000898, 000903; Doc. 22-1 at 6.   Dr. Corzatt noted that Plaintiff can frequently stand and walk and occasionally lift 20 pounds.   Tr. 000903; Doc. 22-1 at 6

Similarly, in rendering his opinion, Dr. Payne reviewed Plaintiff's updated medical records including the treatment notes of Drs. Seshadri and Mellor and Plaintiff's MRIs.   Tr. 001179, 001181-82.   As noted, Dr. Seshadri opined that Plaintiff had ankylosing spondylitis with almost completely fused cervical and lumbar spines, which also affected his hips.   Tr. 00945.   The MRIs revealed that Plaintiff had degenerative disc disease.   Tr. 000973, 000975.   Despite these findings, Dr. Payne opined that Plaintiff has no restrictions or limitations "whatsoever."   Tr. 001183.

Although Drs. Corzatt's and Payne's opinions differ to the extent of Plaintiff's limitations, both opinions nonetheless support Defendant's decision by providing that Plaintiff can perform his own occupation.   Doc. 22-1; Tr. 001179-85.   As long as these opinions serve as a reasonable basis for Defendant's decision, their difference is not material.   *See Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1273 (M.D. Fla. 2006) ("the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point.").

Furthermore, additional evidence supports Defendant's decision.   On February 18, 2014, Dr. Colman noted that Plaintiff enjoyed "power walking," and

walked 2.5 miles daily.   Tr. 000829.   On March 12, 2014, Plaintiff reported that he walked 2 miles every day at a speed of 3.9 miles per hour with a 5% incline.   Tr. 000857.   Dr. Blank also indicated that Plaintiff had a "great exercise tolerance of more than 4 Met[s]."   Tr. 000861.   In addition, Dr. Shuster noted on three occasions on October 10, 2014, December 8, 2014 and February 6, 2015 that Plaintiff was stable on the current analgesic regimen without any significant side effects and was able to function well on the current regimen.   Tr. 000952, 961, 965.

Although certain evidence in the record may support contradictory conclusions, such as Dr. Kunz's opinion that the Simponi treatment no longer helped Plaintiff, it is the plan administrator, not the Court, that weighs and resolves conflicting evidence.   Tr. 000928; see Howard, 929 F. Supp. 2d at 1288.   Accordingly, the Court recommends that Defendant was not arbitrary and capricious in crediting the opinions of Drs. Corzatt and Payne over other doctors' opinions and deciding to terminate Plaintiff's benefits.   See Blankenship, 644 F.3d at 1356 (citation omitted). Based on the findings above, the Court recommends that a reasonable basis existed for Defendant's decision.   See id. at 1354; Howard, 929 F. Supp. 2d at 1288 (internal quotation marks and citations omitted).

### c.   Defendant's reliance on Dr. Payne's opinion

Plaintiff further argues that Defendant should not have relied on Dr. Payne's opinion because it contradicts the opinions of Drs. Habal, Corzatt, Seshadri, Kunz, and Mellor.   Doc. 22 at 14-15, 17-18; Doc. 28 at 12-15.   Defendant correctly notes, however, that it need not accord more weight to the opinions of Plaintiff's treating

doctors than to those of independent reviewers.   Doc. 26 at 13; *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).   The Supreme Court has held that plan administrators neither have to "accord special weight to the opinions of a claimant's physician," nor carry "a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan*, 538 U.S. at 834.   Similarly, the Eleventh Circuit clearly has stated that the plan administrator "need not accord extra respect to the opinions of a claimant's treating physicians." *Blankenship*, 644 F.3d at 1356 (citation omitted). In fact, "[i]t is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled." *Hufford*, 322 F. Supp. 2d at 1359 (citations omitted).   Hence, Defendant may rely on Dr. Payne's opinion over other doctors' opinions.   *See Blankenship*, 644 F.3d at 1356 (citation omitted).

### d. *Surveillance evidence*

Plaintiff argues that Dr. Payne should not have relied on Defendant's surveillance report in rendering his opinion, especially given other medical evidence that conflicts with the surveillance record.   Doc. 22 at 16-18; Doc. 28 at 15-16.   As noted, the question before the Court is whether Defendant, *not Dr. Payne*, had a reasonable basis for its decision.   *See Howard*, 929 F. Supp. 2d at 1288 (internal quotation marks and citations omitted); *Blankenship*, 644 F.3d at 1355 (citations omitted).   The Court will not re-assess individual evidence, such as Dr. Payne's

opinion, because Defendant is entitled to weighing conflicting evidence.   *See Howard*, 929 F. Supp. 2d at 1288 (internal quotation marks and citations omitted). Furthermore, Defendant may submit the video surveillance to Dr. Payne for his review.   *Id.* at 1300 ("[I]t was neither wrong nor unreasonable for [the plan administrator] to submit [the claimant's] medical history and the surveillance video to the independent reviewing health care professionals for their review."); *Schindler v. Metro. Life Ins. Co.*, 141 F. Supp. 2d 1073, 1081 (holding that the plan administrator properly submitted the claimant's medical history and the surveillance tape to the administrator's own doctor).

To support his argument, Plaintiff quotes a proposition from *Bloom v. Hartford Life and Accident Insurance Company*, 917 F. Supp. 2d 1269, 1280 (S.D. Fla. 2013) that surveillance evidence "is of limited utility where the evidence obtained during surveillance is not inconsistent with the claimant's own account of [his] activities." (alteration original) (citation omitted); Doc. 22 at 16; Doc. 28 at 15-16.   Plaintiff omits, however, that the court in *Bloom* held while the above proposition is true, "[surveillance evidence] may be used in conjunction with other medical evidence to support an administrator's decision to terminate benefits."   917 F. Supp. 2d at 1280 (citation omitted).

Here, contrary to Plaintiff's argument, *Bloom* supports Defendant's use of surveillance evidence because Defendant used this evidence in conjunction with other medical evidence, such as the opinions of Drs. Payne and Corzatt.   *See id.*; Doc. 26 at 15.   Furthermore, the surveillance evidence is consistent with Plaintiff's own

account of activities contained in his medical records.   Over a period of 9 days in April 2014 and May 2014, the surveillance video showed Plaintiff engaging in various activities, such as walking quickly, bending, leaning forward, turning his body and head and driving a low-profile sports car.   Tr. 000678, 000680-99, 000763-79; Doc. 21.   This evidence is bolstered by Plaintiff's own accounts of activities to his physicians, including that he enjoyed "power walking," and walked 2.5 miles daily. Tr. 000829.

Eleventh Circuit precedent and persuasive authority of other courts in this district also support Defendant's reliance on the video surveillance in conjunction with the opinions of Drs. Corzatt and Payne in terminating benefits.   For example, the Eleventh Circuit has upheld a plan administrator's decision to rely on the independent medical examiner's opinion "in light of the surveillance report [the administrator] requested." *Turner v. Delta Family-Care Disability and Survivorship Plan*, 291 F.3d 1270, 1274 (11th Cir. 2002) (noting that the investigators observed the claimant walking without a cane whereas she walked with a significant limp and a cane in front of her doctor); *see also Gipson v. Admin. Comm. of Delta Air Lines, Inc.*, 350 F. App'x 389, 392 (11th Cir. 2009) (affirming the plan administrator's decision to terminate decisions partly based on the surveillance evidence of the claimant driving a car, walking with a normal gait, and showing no signs of discomfort entering and existing her car); *Ruple v. Hartford Life and Accident Ins. Co.*, 340 F. App'x 604, 614 (11th Cir. 2009) (holding that the surveillance evidence of

the claimant driving around the town and running errands undermined the claimant's claim of disability).

Likewise, the district court in *Howard* found that the plan administrator properly relied on video surveillance to deny benefits to the plaintiff. 929 F. Supp. 2d at 1298-1300. The court held that the surveillance report was material and probative because 6 days of surveillance provided 21 hours of activity away from home and directly contradicted the claimant's alleged restrictions, seriously challenging the claimant's credibility. *Id.* at 1299-1300.

Here, similar to *Howard*, Defendant's video surveillance captured Plaintiff's various daily activities over a period of 9 days, 3 days in April 2014 and 6 days in May 2014. *See id.*; Tr. 000678-95, 000763-79. The video surveillance showed Plaintiff driving a low-profile sports car between his home, various stores and a bar, turning his head and body and walking. Tr. 000678-95, 000763-79. This evidence challenges Plaintiff's credibility by clearly contradicting Plaintiff's certain accounts of his restrictions and limitations, such as his inability to drive and difficulty getting in and out of a car and walking on flat grounds. *See Howard*, 929 F. Supp. 2d at 1299-1300; Tr. 000678-95, 000763-79; *cf.* Tr. 000150 (Plaintiff's report to Dr. Kunz that Plaintiff could not drive because he could not turn his head); Tr. 000944 (Plaintiff's report to Dr. Seshadri that he has some difficulty with getting in and out of a car and walking outdoors on flat grounds). As a result, the Court recommends that, contrary to Plaintiff's argument, Defendant properly relied on Dr. Payne's

opinion and the video surveillance.   *See Turner*, 291 F.3d at 1274; *Howard*, 929 F. Supp. 2d at 1299-1300.

### e.   *Defendant's conflict of interest*

Finally, Plaintiff argues that Defendant's decision was tainted by a conflict of interest.   Doc. 22 at 18-20.   A conflict of interest exists when the plan administrator "makes eligibility decisions and pays awarded benefits out of its own funds." *Blankenship*, 644 F.3d at 1355 (citation omitted); *see Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 120 (2008) ("The conflict of interest . . . is a common feature of ERISA plans.").   Even when a conflict of interest exists, the burden is on the plaintiff to show that the plan administrator's decision was arbitrary.   *Blankenship*, 644 F.3d at 1355 (citation omitted).   Furthermore, the court still must give deference to the plan administrator's discretionary decision-making.   *Id.* (citations omitted).   The Eleventh Circuit has explained that a structural conflict of interest is only a factor in the court's analysis, and the analysis remains focused on examining whether the administrator's decision has a reasonable basis.   *Id.* (citations omitted).   Hence, a conflict of interest itself does not warrant the court's *de novo* ruling on a benefits decision.   *Id.* at 1356 (citation omitted).

Here, Plaintiff points to the size of Plaintiff's awards, arguing that Plaintiff's benefits could cost over $700,000 to Defendant.   Doc. 22 at 18.   Plaintiff appears to argue that the large size of Plaintiff's awarded benefits led Defendant to try settling his claims, to order surveillance of him, and to terminate his benefits based on conflicting medical evidence.   *Id.* at 18-19.   As Defendant correctly argues, in

*Blankenship*, which involved more than $510,000, the Eleventh Circuit addressed a similar argument to that of Plaintiff and held that "the size of the award is not enough to be the dispositive factor. . . ." *Blankenship*, 644 F.3d at 1357; Doc. 19 at 16. The court held that even a large sum of money is relative when the plan administrator is a large, global company. *Blankenship*, 644 F.3d at 1357 (citation omitted). Furthermore, Plaintiff does not provide sufficient evidence that Defendant was motivated to terminate Plaintiff's benefits based on its monetary gain. Doc. 22 at 18-20; *see id*. Although Plaintiff argues that Defendant's short-term monetary gain led Defendant to negotiate settlement with Plaintiff and to investigate Plaintiff, no facts support Plaintiff's assertion, and Defendant explains that its surveillance of Plaintiff was part of its periodic review of Plaintiff's claims. Doc. 19 at 5; Doc. 22 at 19.

## VIII.   Conclusion

Based upon the findings of fact and conclusions of law, the Court recommends denying Plaintiff's motion for judgment on the record (Doc. 22) and granting Defendant's motion for judgment on the record (Doc. 19) because Defendant's decision to terminate Plaintiff's benefits has a reasonable basis.

ACCORDINGLY, it is respectfully

**RECOMMENDED:**

1.    Plaintiff's Motion for Summary Judgment and Judgment on the Record (Doc. 22) be **DENIED**;

2.     Defendant's Dispositive Motion for Final Summary Judgment, or for Judgment on the Record (Doc. 19) be **GRANTED**; and

3.     Judgment be entered in favor of Defendant.

**DONE** and **ENTERED** in Fort Myers, Florida on this 28th day of June, 2017.

CAROL MIRANDO
United States Magistrate Judge

Copies:
Counsel of record

- 42 -