UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

GEORGE T. GOROS,

       Plaintiff,

v.                                 Case No: 2:16-cv-233-FtM-38CM

SUN LIFE ASSURANCE COMPANY
OF CANADA,

       Defendant.
_____/

## OPINION AND ORDER[1]

This matter comes before the Court on consideration of the Honorable Carol Mirando's Report and Recommendation (Doc. 29), filed on June 28, 2017. Judge Mirando recommends that Plaintiff George T. Goros' ("Goros") Motion for Summary Judgment (Doc. 22) be denied, and that Defendant Sun Life Assurance Company of Canada's ("Sun Life") Motion for Summary Judgment (Doc. 19) be granted. (Doc. 29 at 41-42). Thereafter, Goros filed his objections (Doc. 30), and Sun Life responded in opposition (Doc. 31). The matter is ripe for review.

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

**BACKGROUND**

This case involves an attempt to recover insurance benefits under the Employee Retirement Income Security Act ("ERISA") under a group policy (the "Policy") issued by Sun Life to Goros' former employer, United Plastic Fabricating Inc. ("United Plastic"). From October 1995 to November 2012, Goros was the Executive Vice President of Manufacturing Operations for United Plastic. (Docs. 14-1 at 105; 14-4 at 58). In that role, he wielded administrative responsibility for three manufacturing plants in Michigan, Massachusetts and Florida. (Doc. 14-1 at 115). Notably, the Policy included a long-term disability income provision (the "Long Term Disability Policy") and a life insurance waiver of premium provision (the "Premium Waiver Policy") (collectively, the "Disability Benefits"). (Doc. 14-1 at 34, 60).

Notably, the Long Term Disability Policy provides a monthly benefit to replace the income a disabled person could otherwise earn. (Doc. 14-1 at 77). Its terms state that eligibility for monthly benefits hinges on the production of proof of continued total or partial disability and the continuing care of a doctor who provides regular examinations in accordance with the disabling condition. (Doc. 14-1 at 77). It also requires such information to be provided to Sun Life upon request. (Doc. 14-1 at 77).

Similarly, the Premium Waiver Policy provides for the continuation of life insurance coverage over a totally disabled individual without payment of premiums. (Doc. 14-1 at 60). Its terms allow Sun Life to require periodic proof of the continuation of the total disability condition and to designate a doctor to examine the individual as often as is reasonable. (Doc. 14-1 at 60). Importantly, both the Long Term Disability Policy and the

2

Premium Waiver Policy grant Sun Life total discretionary authority to make all final decisions regarding an individual's eligibility for benefits. (Doc. 14-1 at 95).

Against this backdrop, on November 18, 2012, Goros first visited Dr. Daniel Kunz, D.O. to seek treatment for lower-back and hip pain and stiffness he claimed had persisted for the previous two years. (Doc. 14-1 at 145). While being examined, Goros further claimed he experienced such a loss in his range of motion he could no longer drive. (Doc. 14-1 at 145). Dr. Kunz diagnosed Goros with ankylosing spondylitis, arthritis that affects the spine.[2] (Doc. 14-1 at 148). Goros was prescribed a medication called Simponi to reduce his symptoms and to prevent spinal fusion. (Doc. 14-1 at 148). Thereafter, Goros continued to work at United Plastic until November 20, 2012, when he ceased employment-related activities. (Docs. 14-1 at 103; 14-4 at 58).

On January 4, 2012, Goros filed a claim for benefits under the Long Term Disability Policy. (Doc. 14-1 at 103-116). With that filing, Dr. Kunz submitted an opinion that Goros had severe limitations in his functional capacity, and could not drive or sit for more than three hours, could not walk for more than four hours, and could not function in a full-time or part-time employment capacity. (Doc. 14-2 at 7-8). Subsequently, Sun Life obtained an occupational analysis of Goros' position as the Executive Vice President of Manufacturing Operations for United Plastic, which was classified as light work (the "Occupational Analysis"). (Doc. 14-2 at 126). The Occupational Analysis stated that the demands of light work included "exerting up to 20 pounds of force occasionally or up to

---

[2] Arthritis and Ankylosing Spondylitis, WEBMD, http://www.webmd.com/back-pain/guide/ankylosing-spondylitis#1 (last accessed August 21, 2017).

10 pounds of force frequently, or a negligible amount of force constantly to move objects[,]" as well as "occasional traveling." (Doc. 14-2 at 126).

Goros also participated in an in-person interview with a Sun Life representative on January 22, 2013. (Doc. 14-4 at 54-63). While speaking about his medical history, he stated his joint problems stretched back to the late 1990's, but that some doctors since then had attributed his ailments to his personal activities. (Doc. 14-4 at 58). In November of 2012, Goros stated his pain had become excruciating, and it was then that he sought treatment from Dr. Kunz. (Doc. 14-4 at 59). Notably, Goros also indicated that he was a motorcycle enthusiast, and tearfully contemplated the probability he would never again be able to ride his motorcycle. (Doc. 14-4 at 63).

Continuing its evaluation, on March 4, 2013, Sun Life had Dr. Nadia Habal, M.D. conduct a peer review of Goros' medical records. (Doc. 14-4 at 73-79). After doing so, Dr. Habal opined that it was not medically reasonable for Goros to sustain full time light work employment, regardless of whether there were restrictions or modifications. (Doc. 14-4 at 78-79). Likewise, she opined that it was not medically reasonable for Goros to sustain full time sedentary employment. (Doc. 14-4 at 79).

Thereafter, on March 7, 2013, after conducting the Occupational Analysis, an in-person interview and a peer review of Goros' medical records, Sun Life approved Goros' request for benefits under the Long Term Disability Policy. (Doc. 14-4 at 86). On May 17, 2013, Sun Life also approved Goros' benefits under the Premium Waiver Policy. (Doc. 14-5 at 55).

On November 22, 2013, Sun Life offered Goros $202,351.80 to discharge its obligation to pay the totality of the Long Term Disability Policy. (Doc. 14-6 at 18-19).

4

Similarly, Sun Life offered Goros $46,009.60 to discharge its obligation to pay the totality of the Premium Waiver Policy. (Doc. 14-6 at 25-26). Goros indicated he was not interested in the offer regarding the Long Term Disability Policy, but would consider the offer regarding the Premium Waiver Policy. (Doc. 14-1 at 9-10). No final agreement on either provision was ever reached.

On April 4, 2014, Sun Life began conducting an update of Goros' claim file. (Doc. 14-6 at 28). During the process, Sun Life requested proof of Goros' continued disability and conducted a background check. (Doc. 14-6 at 28, 47-64). Upon reviewing the results of the background check, however, Sun Life discovered that in June of 2013, Goros' ex-wife had posted on social media she was "[h]ome from 5 hrs of riding. 300 miles. Back from 3 great days at bike week w[ith] [Goros]." (Doc. 14-6 at 52). Among other posts, she also uploaded a picture with Goros on December 30, 2013, with the caption "[Goros] is ready for our Christmas drive down the coast!" (Doc. 14-6 at 55).

Suspicion triggered, from April 25, 2014 until April 27, 2014 Sun Life conducted video surveillance of Goros. (Doc. 14-6 at 65-82). On the morning of the first day, a Sun Life representative observed Goros getting in and out of a vehicle, driving, walking quickly, bending, leaning forward, pushing a lawn fertilizer spreader in the yard outside his home, examining sprinklers and stomping on the ground. (Doc. 14-6 at 68-69). In the afternoon, Goros went to a bar where he was observed sitting on a barstool, leaning against the bar, drinking martinis, and periodically exiting to smoke cigarettes over the course of one hour and 50 minutes. (Doc. 14-6 at 70). The Sun Life representative then made conversation with Goros, who was seemingly unaware of the representative's true identity. (Doc. 14-6 at 70). Goros represented that he was selling his home and moving

to Florida, and that he owned and used a motorcycle. (Doc. 14-6 at 70). Goros further represented that he was retired, but that he had a separate business to purchase appreciating properties and sell them for profit. (Doc. 14-6 at 70).

On the morning of the second day, Goros was observed driving back to the same bar he had frequented on the previous day. (Doc. 14-6 at 72). Once there, he opened the trunk, reached in, and bent at the waste to acquire a plastic bag containing multiple items. (Doc. 14-6 at 72). He then closed the trunk, walked to the front door of the bar, and entered. (Doc. 14-6 at 72). Shortly thereafter, he exited, retrieved an item from the passenger side of his vehicle, and then re-entered the bar. (Doc. 14-6 at 72). Later, Goros drove to another property he owned, an office supply store and a home goods store, and was seen bending at the waste to remove a floor mat from his vehicle, shaking the floor mat, and placing it back into his vehicle. (Doc. 14-6 at 72).

On the third day, Goros was observed bending at the waist and knees, carrying a piece of glass under his arm, carrying a metal table frame above his head, carrying a wood table with the help of another person, and carrying a couch with the help of another person. (Doc. 14-6 at 74-76). As the day progressed, Goros was seen at a restaurant, where he bent down while smoking a cigarette, and thereafter at a home development store, where he pushed a shopping cart, picked up items such as small tables and plants, and placed them in the shopping cart. (Doc. 14-6 at 78-79). Upon returning to his home, Goros was again observed picking up a small table from the ground and carrying it. (Doc. 14-6 at 81).

Sun Life also obtained additional video surveillance of Goros between May 18, 2014 and May 24, 2014. (Doc. 14-7 at 4-16). While Goros was not seen on the first day

6

of surveillance, on the second day Goros was observed getting in and out of a newly purchased sports car, driving to a bank, an office supply store, and to the same bar he had been seen at during the prior surveillance. (Doc. 14-7 at 4-8). He remained at the bar during the afternoon, exiting intermittently to smoke cigarettes and converse with individuals. (Doc. 14-7 at 7-8).

On the third day, Goros was seen driving the sports car to a doctor's office, and then to a pharmacy. (Doc. 14-7 at 9). After driving the sports car back to his home, he rode as a passenger to the same bar he had frequented on previous dates. (Doc. 14-7 at 9). He was again observed leaving the bar intermittently to smoke cigarettes, converse with individuals, and at one point, he was seen squatting to pick up a cigarette from the ground. (Doc. 14-7 at 9).

On the fourth day, Goros was seen driving an SUV to a pharmacy and returning to his residence. (Doc. 14-7 at 10-11). And while he remained in his home for the remainder of the day, on the fifth day he was observed walking around his neighborhood carrying poster board, and then driving his sports car back to the same bar he had frequented on prior occasions, exiting intermittently to smoke cigarettes and converse with other individuals, but otherwise remaining there until the late afternoon. (Doc. 14-7 at 11-12). Then, on the last day, Goros was seen conducting a garage sale at his home, wherein he bent at the waste, leaned forward, carried items, smoked several cigarettes and lifted a wheeled seat above the level of his shoulders. (Doc. 14-7 at 14-15).

Sun Life also obtained Goros' updated medical records. Among such records were those of five visits to Dr. Kunz, which indicated an improvement in Goros' condition, including a noticeable decrease in pain and a lessening in stiffness. (Doc. 14-6 at 100-

103, 104-107, 108-113, 114-118, 119-123). In addition, records indicated that Goros also saw Dr. Aaron Coleman, M.D. for right foot pain, and while being evaluated, Goros stated that he enjoyed "power walking" as many as 2.5 miles a day. (Doc. 14-7 at 70). Goros also repeated this interest when seeing Dr. Erika S. Blank, M.D., when he reported that he walked 2 miles at 3.9 mph and a 5% incline every day.³ (Doc. 14-7 at 98).

Sun Life then procured an independent review of Goros' medical file by Dr. Richard S. Corzatt, M.D. (Doc. 14-8 at 4-9). After examining Goros' files and the video surveillance, Dr. Corzatt opined that although the medical records supported a diagnosis of ankylosing spondelitis, Goros had responded well to treatment, his condition was better than when he stopped working in November 2012, and that the surveillance indicated that Goros' activities were compatible with a light occupation. (Doc. 14-8 at 9). Dr. Corzatt opined that Goros "should be able to sit frequently changing positions every 45 minutes as needed, [to] stand and walk frequently [for] no more than an hour at a time, [to] occasionally lift [up] to 20 pounds, and [to] keyboard on a frequent basis." (Doc. 22-1 at 7).

Given the benefit of the independent medical report, the surveillance tapes, the updated medical information, and the other information in the claim file, Sun Life concluded that Goros was not entitled to continued Disability Benefits and ceased distribution of same as of August and September 2014. (Doc. 14-8 at 12-14, 19-24).

---

³ Dr. Coleman ultimately performed a cheilectromy on Goros after his visit to Dr. Blank, which is a procedure to remove a bone spur that has formed on a toe. (Doc. 14-7 at 73-75). Marc First MTP Cheilectomy, AMERICAN ORTHOPEDIC FOOT & ANKLE SOCIETY, http://www.aofas.org/footcaremd/treatments/Pages/First-MTP-Cheilectomy.aspx (last accessed on August 21, 2017).

Goros then sought administrative review of Sun Life's determination. (Doc. 14-8 at 27-28).

During that process, Sun Life obtained another independent peer review of Goros' medical records by Dr. Dennis Payne, Jr., M.D. (Doc. 14-11 at 40-45). Dr. Payne found that while the diagnosis of ankylosing spondylitis had been established by the information in the claim file, the video surveillance data indicated that Goros had "no restrictions or limitations whatsoever." (Doc. 14-11 at 43). On this basis, in July of 2015 Sun Life affirmed its decision to terminate the Disability Benefits. (Doc. 14-11 at 50-63, 72-97).

Thereafter, on March 25, 2016, Goros filed the Complaint seeking a determination that the Disability Benefits should be reinstated and seeking the recovery of any unpaid benefits. (Doc. 1). Goros and Sun Life have submitted cross motions for summary judgment. (Docs. 19, 22).

**STANDARD**

ERISA benefit denial cases present a unique scenario to courts where the standard summary judgment considerations do not apply. *Hert v. Prudential Ins. Co. of Am.*, 650 F. Supp. 2d 1180, 1190 (M.D. Fla. 2009). "[W]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment . . . do not apply." *Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999)). In substance then, a district court reviewing such a motion for summary judgment sits more as an appellate tribunal than as a trial court. *See Curran v. Kemper Nat. Servs., Inc.*, 2005 WL 894840, *7 (11th Cir.2005) (unpublished *per curiam* opinion)

(quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir.2002)); *see also Crume*, 417 F. Supp. 2d at 1272. "It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Id.* As such, "the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point." *Crume*, 417 F. Supp. 2d at 1273.

A plaintiff must prove his entitlement to contractual benefits. *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998). "This is true regardless of whether the claim denial was from the onset of the claimed disability or whether the claim denial was a termination of benefits that had been paid before the denial." *Walker-Hall v. Am. Int'l Life Assur. Co. of New York*, 788 F. Supp. 2d 1355, 1358 (M.D. Fla. 2011).

"ERISA itself provides no standard for courts reviewing the benefits decisions of plan administrators or fiduciaries." *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)). The Eleventh Circuit, though, has laid out a multi-step framework to guide courts in reviewing such a decision. *Blankenship,* 644 F. 3d at 1354. These steps are:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it

> (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355.

"A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." *Id.* In such an event, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.* (internal quotations omitted). Even where a conflict of interest exists, "courts still owe deference to the plan administrator's discretionary decision making as a whole. *Id.* (citing *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1363 (11th Cir. 2008)). "Courts must account for a structural conflict of interest, when one exists, as "a factor" in the analysis: but the basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision." *Id.* (citing *Conkright v. Frommert*, 559 U.S. 506, 521 (2010)).

After conducting a careful and complete review, a district judge "may accept, reject, or modify . . . the findings or recommendations made by the magistrate judge." *See* 28 U.S.C. § 636(b)(1). The district judge "shall make a *de novo* determination of those

> (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355.

"A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." *Id.* In such an event, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.* (internal quotations omitted). Even where a conflict of interest exists, "courts still owe deference to the plan administrator's discretionary decision making as a whole. *Id.* (citing *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1363 (11th Cir. 2008)). "Courts must account for a structural conflict of interest, when one exists, as "a factor" in the analysis: but the basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision." *Id.* (citing *Conkright v. Frommert*, 559 U.S. 506, 521 (2010)).

After conducting a careful and complete review, a district judge "may accept, reject, or modify . . . the findings or recommendations made by the magistrate judge." *See* 28 U.S.C. § 636(b)(1). The district judge "shall make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* And "[t]he judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

## DISCUSSION

The Report and Recommendation recommends granting Sun Life's Motion for Summary Judgment and denying Goros' Motion for Summary Judgment. (Doc. 29 at 41-42). Goros lodges four main objections to that conclusion, arguing: (1) Judge Mirando erred by finding that Dr. Corzatt's opinion did not contradict the Occupational Analysis and supports Sun Life's decision because Goros is unable to perform out of state travel or to sit for more than 45 minutes at a time; (2) Judge Mirando erred by finding that Goros did not present any evidence that the missing page of Dr. Corzatt's opinion was not before Sun Life when Sun Life terminated his benefits; (3) Judge Mirando erred by finding that the surveillance videos, as well as Dr. Corzatt's and Dr. Payne's opinions, provided a reasonable basis to support Sun Life's decision to terminate benefits; and (4) Judge Mirando erred by finding that no facts support Goros' assertion that Sun Life's short-term monetary gain led it to negotiate toward a settlement with Goros regarding his Disability Benefits, and when those advances were rebuffed, to investigate him. (Doc. 30). But these arguments merely regurgitate the precise contentions already asserted and considered in the briefing on the motions for summary judgment. Having undertaken an independent review of the record, the Court finds that except for two small additions by the Court regarding Goros' first and second objection, Goros' objections were adequately addressed by the Report and Recommendation. Consequently, the Court will accept and

adopt the Report and Recommendation in its entirety and include the following additional analysis.

I.  DR. CORZATT'S LIMITATIONS

Goros' first objection argues that Judge Mirando erred by finding that Dr. Corzatt's opinion did not contradict the Occupational Analysis because it did not take into account the demands of his job.  (Doc. 30 at 1).  Specifically, Goros avers that when working for United Plastic, he spent as many as 72 days a year traveling out of state in 2011.  He reasons that if those demands were to hold true in the future, such activity would be impossible under Dr. Corzatt's limitations, which he contends allows for him to sit for no more than 45 minutes at a time.  He argues that Sun Life's decision to terminate benefits was arbitrary.  The Court disagrees.

First, the correct lens to determine the congruence of Dr. Corzatt's opinion is not the previous demands of Goros' employment at United Plastic, but, as the Policy provides, the "usual and customary employment, business, trade, profession or vocation that the [e]mployee performed as it is generally recognized in the national economy immediately prior to the first date [t]otal or [p]artial [d]isability began." (Doc. 14-1 at 53-54).  Crucially, the Policy provides that such analysis "is not limited to the job or position the Employee performed for the [e]mployer or performed at any specific location."  (Doc. 14-1 at 54).  With this in mind, the Occupational Analysis determined that Goros' position as the Executive Vice President of Manufacturing Operations is properly classified in the general economy at the light exertion level.  (Doc. 14-2 at 126).  Notably, light work in the general economy requires "occasional traveling." (Doc. 14-2 at 126).  The pertinent issue

is whether Dr. Corzatt's limitations are consistent with the demands of occasional traveling.

Second, it tackling that question, Goros commingles the concept of remaining seated in the same position with that of sitting while changing positions. Contrary to Goros' argument, Dr. Corzatt's opinion does not limit him to 45 minutes in a seated position. Instead, it allows for him to "sit frequently changing positions every 45 minutes as needed, [and to] stand and walk frequently [for] no more than an hour at a time." (Doc. 22-1 at 7). Though Dr. Corzatt does not precisely define what he means by the phrase "changing positions," its natural meaning conjures the mere alteration in overall body posture while seated. The Court is unaware of any form of travel that would prohibit such a basic human movement.

What's more is that Dr. Corzatt's opinion also allowed for standing and walking for up to an hour. (Doc. 22-1 at 7). If, in the course of his employment, Goros were to travel by automobile, he would possess the unfettered autonomy to stop, stand, stretch and walk at his discretion. Even if Goros were required to travel via airplane from one location to another, it is reasonable to assume that he would not be completely barred from standing to stretch in the aisle or from walking to the men's room during the course of the flight.

Finally, the Eleventh Circuit has previously upheld an administrative claim denial where evidence indicates that shifting positions would enable a claimant to perform clerical work. *See Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270 (11th Cir. 2002). In *Turner*, the claimant's disability benefits were terminated, and the administrator's decision was subsequently upheld, after she received medical

approval to perform clerical activities so long as she could change positions as needed, she could refrain from lifting, twisting or bending, and the claimant was not required to lift more than ten pounds. *Id.* at 1273. Similar to *Turner*, the Court finds no reason that Goros cannot perform the duties of his occupation here, so long as the limitations outlined by Dr. Corzatt are allowed. And because those limitations may be observed by Goros while traveling, the Court finds that Dr. Corzatt's opinion does not contradict the Occupational Analysis.[4]

## II. DR. CORZATT'S FULL OPINION

Second, Goros argues Judge Mirando erred by finding he presented no evidence the missing page of Dr. Corzatt's opinion was not before Sun Life when it terminated his Disability Benefits. (Doc. 30 at 2). Instead, Goros argues he did so by pointing out that Sun Life failed to outline the limitations in Dr. Cozatt's opinion when explaining the termination of the Disability Benefits in letter form. Additionally, Goros argues evidence that Sun Life considered less than the entirety of Dr. Corzatt's opinion can be discerned by the fact that Sun Life's internal notes do not mention Dr. Corzatt's limitations. Goros' argument fails.

Though the fact that Dr. Corzatt's opinion was not expressly mentioned by Sun Life constitutes circumstantial evidence it was not considered, the Court is not prepared to accept Goros' otherwise unbridged conclusion. For starters, Sun Life – the plan

---

[4] Goros' claim that he cannot function within these parameters is further undermined by the fact that during the time he claimed to be disabled, and just months after his in-person interview with a Sun Life representative where he tearfully contemplated permanently foregoing motorcycle riding, social media accounts place him on a 300 mile, five hour motorcycle cruise. (Doc. 14-6 at 52). Similarly, Goros' ability to take a Christmas drive "down the coast," as represented on social media, is indicative of an ability to perform occasional travel. (Doc. 14-6 at 55).

administrator – contends that it considered Dr. Corzatt's entire medical review, including the last page, which lists Goros' medical limitations. (Doc. 26 at 10). Additionally, Sun Life's attorney maintains in an affidavit that the omission on the record was merely a result of an error in scanning and uploading the document. (Doc. 27-1 at ¶ 6).

Nothing about the omission would lead to the conclusion that Sun Life did not consider the entirety of the evidence in rendering its decision. The denial letter simply stated that an orthopedic surgeon found that the video surveillance indicated that Goros' activities appeared to be compatible with a light occupation. (Doc. 14-8 at 13). It did not conclude that the evidence cited constituted the entire cited medical opinion, nor did it make any unequivocal statements about Goros' abilities. (Doc. 14-8 at 13). Moreover, the denial letter is not contradicted by Dr. Corzatt's limitations. To the contrary, given that Dr. Corzatt opined Goros' activities appeared to be compatible with a light occupation, (Doc. 14-8 at 3), and the Court has already found the restrictions imposed by Dr. Corzatt do not contradict the Occupational Analysis, the contents of the denial letter are precisely in line with the thrust of the facts.

By the same token, although Sun Life's internal notes do not mention Dr. Corzatt's limitations, they do not mention Dr. Corzatt's opinion by name at all. (Doc. 14-1 at 6). Instead, Sun Life's internal notes comprise short, cursory, entries that mark events including (1) the provision of Goros' medical file to Dr. Corzatt; (2) a "medical review" in which Goros was deemed capable of performing light work; and (3) that a claim denial was sent. (Doc. 14-1 at 6). The context of the record provides the clear inference that the "medical review" was that of Dr. Corzatt, but Goros does not indicate why he would expect to find a specific reference to Dr. Corzatt's limitations in such a format. Upon

consideration, it seems that such an in-depth entry into the substance of the medical opinion would exceed the surface level specificity with which the other notes were kept. Consequently, the fact Dr. Corzatt's limitations were not found in Sun Life's internal notes is not a strong indicator they were not considered.

At base, Goros' argument is flawed because it hinges on the presumption that every specific consideration be spelled out in every decisional manifestation. Such a result would be absurd and unwieldy. In the eyes of the Court, Sun Life's denial letters would indicate that it had considered the entire information at hand.

Accordingly, it is now

**ORDERED:**

1. Magistrate Judge Carol Mirando's Report and Recommendation (Doc. 29) is **ACCEPTED** and **ADOPTED** and the findings incorporated herein.
2. Sun Life's Motion for Summary Judgment (Doc. 19) is **GRANTED**.
3. Goros' Motion for Summary Judgment (Doc. 22) is **DENIED**.
4. The Clerk is **DIRECTED** to enter judgment accordingly, terminate any pending motions and deadlines, and to close the file.

**DONE** and **ORDERED** in Fort Myers, Florida this 28th day of August, 2017.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record

17